UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
RAY FELTON and UPTAL THAKRAR, on : 04 Civ. 7892 (CSH)
behalf of themselves and all others similarly :
situated, : MEMORANDUM OPINION
: AND ORDER
      Plaintiffs, :
:
   -against- :
:
MORGAN STANLEY DEAN WITTER & CO., :
:
      Defendant. :
-----------------------------------------------------------------x

HAIGHT, Senior District Judge:

  Plaintiffs Ray Felton and Uptal Thakrar, on behalf of themselves and others similarly situated (collectively, "Plaintiffs"), brought this putative class action in a New York state court against defendant Morgan Stanley Dean Witter & Co. ("Defendant" or "Morgan Stanley"), alleging a common law claim for breach of contract. Defendant removed the case to this Court, asserting that Plaintiffs' state law claim was preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77p & 78bb(f). Plaintiffs have moved to remand the action to the state court on the ground that SLUSA does not preempt it. Defendant has moved to dismiss the action on the grounds that SLUSA applies to it and mandates its dismissal.

  The Court previously reserved decision on the motions pending the decision of the Supreme Court in *Dabit v. Merrill Lynch, Pierce, Fenner & Smith*, 395 F.3d 25 (2d Cir. 2005) ("*Dabit I*"), *cert. granted*, 126 S. Ct. 34 (Sept. 27, 2005). On March 21, 2006, the Supreme Court handed down its ruling in *Dabit*, 547 U.S. \_\_, 126 S. Ct. 1503 ("*Dabit II*"). Thereafter, I directed the parties to file

1

additional[1] supplemental memoranda of law addressing what effect, if any, the Supreme Court's *Dabit* decision has upon the present motions, and the parties made such supplemental submissions.

After considering controlling case law, the submissions from the parties, and the representations made at oral argument, the Court grants Defendant's motion and denies Plaintiffs' motion.

**BACKGROUND**

Plaintiffs' Amended Class Action Complaint (the "Amended Complaint") alleges that they are, and purport to represent in this putative class action, investors who had brokerage accounts with Morgan Stanley. Morgan Stanley is a financial institution which provides brokerage, asset management, and capital markets services to individuals, institutions, and corporations.

When Plaintiffs opened accounts with Morgan Stanley, they entered into a series of contractual agreements. Two such contracts were the "Client Account Agreement" and the "Confirmation Agreement." The Client Account Agreement provided that: "Securities accounts are subject to federal and state law and the rules and customs of the NYSE, the NASD, and other industry self-regulatory organizations and exchanges." Amended Complaint ¶ 6. Similarly, the Confirmation Agreement provided that: "All transactions are subject to the rules and customs of the Exchange or Market where executed." *Id.* ¶ 8.

Plaintiffs allege that pursuant to these agreements, the rules and customs of the National Association of Securities Dealers ("NASD"), the New York Stock Exchange ("NYSE"), and other self-regulatory organizations were contractually imposed upon Morgan Stanley, for the benefit and

---

[1] The parties were previously directed to file supplemental memoranda in response to the Second Circuit's issuance of its *Dabit* decision.

protection of Plaintiffs. *See id.* ¶ 9. Plaintiffs further allege that Defendant breached its contracts with them by failing to obey these rules and customs, in the following manner.

Morgan Stanley has a practice group known as the "Technology Equity Research Team" ("Technology Research Team"). As its name suggests, this team of stock analysts researches and analyzes companies in various technology sectors. The team then produces reports and recommendations on whether to buy, hold, or sell securities of particular companies in these sectors.

Morgan Stanley also has an "Investment Banking Division" ("IBD"). The IBD provides services such as underwriting to provide financing to public companies and to take private companies public through initial public offerings ("IPOs"). *Id.* ¶ 14.

Plaintiffs allege that Morgan Stanley's breach of its contractual obligations to them arose out of the interaction of the Technology Research Team and the IBD. Morgan Stanley served two distinct types of clients, which I will refer to as "customer clients" and "company clients." The Technology Research Team served individual and institutional customers by providing ostensibly objective research reports to help customers such as Plaintiffs make sound and well-informed decisions about whether to invest in the companies discussed in the reports. Company clients paid fees for services provided by defendant's IBD, as described *supra*.

According to Plaintiffs, Morgan Stanley's IBD business was highly lucrative. Moreover, some of the companies analyzed by the Technology Research Team on behalf of its customer clients were also company clients serviced by the IBD, or which IBD hoped to service.[2] As a result,

---

[2] See Amended Complaint, Ex. A., for a list of twenty-one companies whose shares Plaintiffs allege they purchased prior to and subsequently held as a result of Defendant's investment reports and recommendations. Plaintiffs allege that while Morgan Stanley's Technology Research Team analyzed these companies on behalf of Plaintiffs, Defendant also had IBD relationships with them. *Id*. ¶ 15.

3

Plaintiffs allege that the Technology Research Team tainted their reports with overly optimistic forecasts in an effort to retain business with Defendant's company-clients, as well as acquire new ones. In other words, according to Plaintiffs, "Morgan Stanley sought, and in fact captured, enormous IBD revenue by trading its analysts' independence for IBD business and revenue." *Id.* ¶ 24. Plaintiffs allege that the Technology Research Team and the IBD are, in fact, "two-halves of a *single* team." *Id.* ¶ 16 (emphasis in original). According to Plaintiffs, "[a]s a result of this symbiotic relationship, Morgan Stanley research analysts virtually never gave a company a poor rating because it would have jeopardized Morgan Stanley's efforts to obtain investment banking engagements and fees from technology companies." *Id.* ¶ 17.

Further, Plaintiffs allege that Morgan Stanley's technology analysts were asked to perform investment banker duties, thus making them "essentially investment bankers," *id.* ¶ 20, and that Morgan Stanley tied its Technology Research Team analysts' compensation directly to the IBD deals brought in, *id.* ¶¶ 24 - 27. *See also id.* ¶ 19 (alleging that favorable analyst reports helped maintain high stock prices, allowing Defendant to reap greater underwriting fees from future add-on offerings from IBD clients).

Finally, Plaintiffs contend that Defendant often "pitched" prospective IBD clients by "promising favorable research coverage from [a] Morgan Stanley technology research analyst." *Id.* ¶ 21; *see generally id.* ¶¶ 16-24. While Morgan Stanley is the sole defendant in this case, this allegation implicates its company-clients in wrongdoing as well, since it implies that companies agreed to hire Morgan Stanley for its investment banking services in exchange for future favorable coverage by the Morgan Stanley Technology Research Team.

By reason of this conduct, Plaintiffs contend that "Morgan Stanley failed to provide objective

4

research and recommendations, as it contracted to provide to Plaintiffs and Class members, and, therefore, Morgan Stanley breached each of the standardized contracts[3] with the Plaintiffs and Class members." *Id.* ¶ 18; *see generally id.* ¶¶ 41-46.

Plaintiffs filed this action in New York State Supreme Court on September 8, 2004, and filed and served their Amended Complaint in the same court on September 27, 2004. Defendant removed the case to this Court on October 5, 2004. The present motions followed. The Court heard oral argument on October 12, 2005. As mentioned above, decision on the motions was reserved pending the Supreme Court's ruling in the *Dabit* case, which involved issues similar to those presented in the case at bar.

---

[3] As mentioned, those contracts obligated Morgan Stanley to obey the rules and customs of the NYSE, NASD, and other self-regulatory organizations, which Plaintiffs assert Defendant failed to do. For example, Plaintiffs listed in ¶ 9 of the Amended Complaint various Conduct Rules contained in the NASD Manual & Notices to Members that Plaintiffs allege Defendant breached:

> A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.
>
> All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered. No material fact or qualification may be omitted if the omission, in light of the context of the material presented, would cause the communication to be misleading.
>
> Exaggerated, unwarranted or misleading statements or claims are prohibited in all public communications of members . . . .
>
> In making a recommendation in advertisements and sales literature, whether or not labeled as such, a member must have a reasonable basis for the recommendation . . . .

5

# DISCUSSION

## I. The Statutes: An Overview

### A. The Original Statutes and the Private Securities Litigation Reform Act

During the fourth decade of the 20th century, the Congress became concerned about the honesty of and investor confidence in the nation's securities markets. That concern led to the passage of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, together with the promulgation of rules under power delegated by Congress to the Securities and Exchange Commission.

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase and sale of any security . . . , any manipulative or deceptive device or contrivance as the [SEC] may prescribe." 15 U.S.C. § 78j. Rule 10b-5, which implements this provision, forbids the use, "in connection with the purchase or sale of any security,' of "any device, scheme, or artifice to defraud" or any other "act, practice or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b-5. Among Congress' objectives in passing the 1934 Act was "to insure honest securities markets and thereby promote investor confidence after the market crash of 1929. More generally, Congress sought to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citations and internal quotation marks omitted). Conduct proscribed by § 10(b) and Rule 10b-5 subjects an offender to criminal prosecution or to a private action for damages.

During the last decade of the century, Congress became concerned about perceived abuses of the class-action mechanism in lawsuits involving nationally traded securities. *See Dabit II*, 126

S. Ct. at 1510.[4]  In response, in 1995, Congress passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77z-1, 78u.  Amongst other reforms, the PSLRA imposed limits on recoverable damages and attorney's fees, introduced heightened pleading standards for class actions alleging fraud in the sale of national securities, and authorized a stay on discovery pending judicial determination of the sufficiency of the claims.  *Dabit II*, 126 S. Ct. at 1511.  This effort to deter or quickly dispose of nuisance suits imposed particular burdens on those plaintiffs seeking to bring federal securities fraud class actions, but it also had the unintended consequence of prompting some members of the plaintiff's bar to avoid federal courts all together.  *Id.*  Rather than facing the obstacles imposed by the new statute, plaintiffs brought class action cases under state law, often in state courts.  "To stem this shift from Federal to State courts and prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of [PSLRA], Congress enacted SLUSA."  *Id.* (internal citations and quotation marks omitted).

**B.    SLUSA**

SLUSA must be examined in greater detail because it is the statute Morgan Stanley relied upon in removing Plaintiffs' putative class action from the state court and relies upon in moving this Court to dismiss the action on the ground that SLUSA preempts it.

SLUSA makes federal law the exclusive source of remedy for certain class actions alleging securities claims.  Consequently, the statute confers upon federal courts exclusive jurisdiction over those actions and preempts state courts from entertaining them.

---

[4] "Nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent" were amongst the abuses noted.  *Dabit II*, 126 S. Ct. at 1510-11 (internal citation and quotation marks omitted).

In pertinent part, SLUSA provides that:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging –
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> (B) that the defendant used or employed any manipulative device in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

If a state law class action falls under either of these categories, SLUSA preempts the action. "SLUSA was intended to completely preempt the field of *certain types* of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 123 (2d Cir. 2003) (emphasis in original). SLUSA further provides that such actions may be removed to federal court. 15 U.S.C. § 78bb(f)(2).

Under the statutory scheme, four conditions must be satisfied to trigger SLUSA's removal and preemption provisions: (1) the underling suit must be a "covered class action";[5] (2) the action

---

[5] In pertinent part, SLUSA defines a "covered class action" as:

> (i) any single lawsuit in which –
> (I) damages are sought on behalf of more than 50 persons or prospective class members, . . .
> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members . . . .

15 U.S.C. § 78bb(f)(5)(B); *see Dabit II*, 126 S. Ct. at 1512.

must be based on state or local law; (3) the action must concern a "covered security";[6] and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative device or contrivance "in connection with the purchase or sale" of that security. *See Dabit II*, 126 S. Ct. at 1511-12.

## II. The Present Motions

Defendant moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. According to Defendant, SLUSA requires such a dismissal. Plaintiffs counter that SLUSA does not apply to the present action, and that, accordingly, the matter should be remanded to state court.

In support of their position, Plaintiffs made two main arguments: (1) The Amended Complaint asserts a state law breach of contract claim, not a securities fraud claim, and, therefore, SLUSA does not preempt the action; and (2) Even if Plaintiffs claim is described as one sounding in securities fraud, SLUSA is inapplicable because the fourth requirement for SLUSA preemption, that a fraud was perpetrated "in connection with the purchase or sale" of a security, is not present here.[7]

---

[6] A "covered security" is a security traded nationally and listed on a regulated national exchange. S*ee Dabit II*, 126 S. Ct. at 1512. More specifically, the statute defines the term as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [15 USCS § 77r(b)], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such term shall not include any debt security that is exempt from registration under the Securities Act of 1933 [15 USCS §§ 77a *et seq*.] pursuant to rules issued by the Commission under section 4(2) of that Act [15 USCS § 77d(2)]." 15 U.S.C. § 78bb(f)(5)(E).

[7] Plaintiffs' did not appear to dispute that their claim as pleaded in the Amended Complaint satisfied the first three of the SLUSA requirements: first, the underlying suit is a "covered class action" as defined by SLUSA; second, the action is based upon common law principles of breach of contract enforceable under state law; and third, the action concerns a

9

With regard to their second argument, Plaintiffs asserted that they neither *purchased* nor *sold* securities as a result of the Technology Research Team's allegedly faulty reports and recommendations, but only that they purchased securities *prior to* Defendant's issuance of its reports and recommendations, and that they *held* those securities, rather than selling them on the market, as a result of the reports and recommendations. Thus, Plaintiffs sought to identify themselves as members of a so-called "holder class," assertedly exempt from SLUSA preemption.

But Plaintiffs' contention is now precluded by the Supreme Court's decision in *Dabit II*, which makes clear that there is no "holder class" exemption under the "in connection with the purchase or sale" prong of the SLUSA analysis. *See Dabit II*, 126 S. Ct. at 1515 ("The holder class action that respondent tried to plead . . . is distinguishable from a typical Rule 10b-5 class action only in one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA preemption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities."). In consequence of the *Dabit II* decision, Plaintiffs have (as they must) now abandoned this second argument.[8] *See* Second Supplemental Memorandum of Law in Support of Plaintiffs' Cross-Motion for Remand and In Opposition to Defendant's Motion to Dismiss (wherein Plaintiffs are now reduced to the argument that the Amended Complaint asserts a claim for breach of contract, not securities fraud).

Thus, the resolution of both motions turns on whether the Amended Complaint makes out purely a state law breach of contract claim, or whether, in fact, Plaintiffs' cause of action is more

---

"covered security" as defined by SLUSA.

[8] The Court notes that prior to the Supreme Court's *Dabit II* decision, Plaintiffs' second argument bore some weight, as the Second Circuit's prior opinion in the *Dabit* case indicated that a "holder class" exemption might exist in certain cases. *See Dabit I*, 395 F.3d 25 (2d Cir. 2005).

properly described as the sort of securities fraud class action claim Congress intended to be covered by SLUSA.

III. **The Amended Complaint**

In the Amended Complaint setting forth their class action claim in the state court, Plaintiffs do not allege a federal securities claim or refer to the federal securities laws. Their claim is cast solely in terms of common law breach of contract. One may reasonably infer that Plaintiffs have framed their pleading in an effort to avoid SLUSA preemption. The question is whether they have succeeded in doing so.

That inquiry is not foreclosed by the manner in which Plaintiffs have chosen to plead their claim. Ordinarily, a plaintiff is the master of his complaint, and whether or not a federal claim exists must be decided based on the face of the complaint's allegations. However, an exception to this "well-pleaded complaint" rule exists where federal law completely preempts a given field, and, in enacting SLUSA, "'Congress could not have spoken more clearly' about its intention 'to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims.'" *Dabit I*, 395 F.3d at 33 (vacated in part on other grounds)[9] (quoting *Spielman*, 332 F.3d at 123). As a result, "when SLUSA's conditions have been satisfied, the plaintiff has necessarily invoked federal question jurisdiction, even though he [or she] did not wish to, and the court must dismiss for failure to state a claim because SLUSA has preempted the state law basis

---

[9] In *Dabit II*, the Supreme Court disagreed with the Second Circuit's conclusion that a "holder class" exemption should be found to exist within the SLUSA framework, and accordingly vacated the judgment on that ground. The Supreme Court did not, however, take issue with other substantive conclusions reached by the Second Circuit in the *Dabit I* decision, and for those conclusions the Second Circuit's *Dabit I* decision is still good law.

11

for the claim." *Id.* at 33-34 (internal quotation marks and citation omitted; alteration in original). "Under SLUSA, then, we must look beyond the face of the complaint to analyze the substance of the allegations made." *Id.* at 34 (citing *Spielman* and *Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 879 (8th Cir. 2002) (where complete preemption applies, "plaintiff may not avoid federal question jurisdiction and the preemption of state law claims by artfully concealing the federal question in an otherwise well-pleaded complaint under state law")); *see also Xpedior Creditor Trust v. Credit Swuisse First Boston (USA) Inc.,* 341 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) ("After *Spielman*, it is now clear that courts must probe the plaintiff's pleading to determine whether SLUSA preemption applies."); *Bowlus v. Alexander & Alexander Servs., Inc.*, 659 F.Supp. 914, 918 (S.D.N.Y. 1987) (in a case involving removal on the basis of a federal question under 28 U.S.C. § 1441(b), "a federal court may look behind the complaint to preclude a plaintiff from defeating federal question jurisdiction through 'artful pleading,' that is, by disguising a federal claim as a claim arising under state law").

While facially the Amended Complaint alleges a common law claim for breach of contract, the question is whether plaintiffs are engaging in artful pleading to disguise substantive allegations that Morgan Stanley engaged in "[a] misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," as those words are used in SLUSA, 15 U.S.C. § 78bb(f)(1). I conclude without difficulty that Plaintiffs' claim is a securities fraud wolf dressed up in a breach of contract sheep's clothing. The gravamen of the Amended Complaint, pleaded in ¶ 18, is that conflicts of interest were created by "Morgan Stanley's IBD relationships with the companies Morgan Stanley analysts covered" and "Morgan Stanley's compensation of analysts based on the IBD deals they brought to Morgan Stanley and the IBD revenue they generated," conflicts "which

were undisclosed to Plaintiffs and the class members . . . . While Morgan Stanley customers believed that they were paying for and receiving informed and objective investment advice, they actually received recommendations based on Morgan Stanley's existing or desired investment banking deals." Plaintiffs describe this conduct as a breach by Morgan Stanley "of the standardized contracts with the Plaintiffs and Class members," and so it may have been, but it is also a quintessential example of a fraudulent omission of a material fact under the federal securities laws.[10]

Plaintiffs and the putative class members retained the services of Morgan Stanley as a broker. "[A]ny distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to her clients." *Zandford*, 535 U.S. at 823. One of the industry Conduct Rules upon which Plaintiffs base a breach of contract claim provides that in "member communications with the public" with respect to, *inter alia*, "service offered," "[n]o material fact or qualification may be omitted if the omission, in light of the context of the material presented, would cause the communication to be misleading." This is fraud analysis. The Amended Complaint must necessarily be read to allege that Morgan Stanley's description of its brokerage services to customer clients such as Plaintiffs fraudulently omitted the material facts of the relationship between its investment banking and research departments and the manner in which research analysts were

---

[10] Given Plaintiffs' theory of the case, Morgan Stanley's failure to disclose to customer clients the "symbiotic" relationship between its investment banking and research departments constituted the omission of a material fact under federal securities laws. "To fulfill the materiality requirement under 10(b), there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." *Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cr. 2005) (citations and internal quotation marks omitted). The indignation with which Plaintiffs describe Morgan Stanley's failure to disclose reflects the importance they attach to the alleged relationship between the two Morgan Stanley departments, which if true would concern any reasonable investor relying upon the recommendations of the research department.

13

compensated. Stripped to its essentials, the Amended Complaint alleges that Morgan Stanley breached its contracts with Plaintiffs *by engaging in a fraudulent scheme*. To regard the Amended Complaint as alleging nothing more than common law breaches of contract would reward artful pleading in a manner that the law does not permit.

Such a conclusion is supported by the Second Circuit's decision in *Dabit I*, a case in which the plaintiffs' allegations of wrongdoing are very similar to those made against Defendant in the case at bar.[11] Plaintiffs in that case alleged that Merrill Lynch "issued biased research and investment recommendations designed to garner investment banking business," 395 F.3d at 28, and the crux of one plaintiff's complaint was that "Merrill Lynch provided biased investment advice in violation of its contract" with the plaintiff, *id.* at 30. As in the case at bar, that plaintiff argued that the contract claim was not preempted because it did not allege any misrepresentation or omission in connection with that claim. *See id.* at 48 n.17. The Second Circuit rejected that argument, concluding that such allegations were present because "the complaint allege[d] that the breach of contract consisted of the provision of 'biased advice' regarding investments," and the "alleged promises of objectivity . . . [we]re only rendered misleading by the complaint's further allegation that Merrill Lynch produced and delivered biased research." *Id.* The reasoning behind the Second Circuit's conclusion applies with equal force in the case at bar. In fact, Plaintiffs' counsel conceded at oral argument that the

---

[11] Plaintiffs themselves have repeatedly conceded that the allegations made by the plaintiffs in *Dabit* are essentially the same as those made in this case. In their Supplemental Memorandum of Law in Support of Plaintiffs' Cross-Motion for Remand and In Opposition to Defendant's Motion to Dismiss at 5, Plaintiffs' assert that they "allege underlying facts that are strikingly similar to those alleged against Merrill Lynch in *Dabit*." At oral argument, Plaintiffs' counsel stated, "I believe the facts in *Dabit* are virtually identical to the facts in this case, in *Felton*," Oral Argument Transcript at 25:3-4, and, "I think Dabit essentially alleged the same set of facts involving research analysts and conflicts and bias," *id.* at 38:23-24.

Second Circuit's rejection of the *Dabit* plaintiff's argument on this point essentially "does [Plaintiffs] in" with regard to that issue: counsel stated, with admirable candor, "I think what footnote 17 does, your Honor, it establishes in our case that there was a misrepresentation or omission so that that portion of the fourth element of SLUSA is satisfied." Oral Argument Tr. at 38: 25; 40:5-8. I agree.

To the same effect is *Dacey v. Morgan Stanley Dean Witter & Co.*, 263 F. Supp. 2d 706 (S.D.N.Y. 2003), a case purportedly brought by the same attorneys representing Plaintiffs in the case at bar, and against the same defendant. The allegations made in that case are nearly identical to those made here,[12] and in that case, too, the plaintiff asserted that SLUSA preemption was inappropriate because the complaint alleged only a common law breach of contract claim. Judge Swain unequivocally rejected this assertion, convincingly stating, "[A]lthough the Complaint asserts only one count of breach of contract, its operative allegations plainly focus on misrepresentations and other alleged breaches of disclosure duties." *Dacey*, 263 F. Supp. 2d at 710. After reviewing the entirety of the allegations in the complaint, Judge Swain found "that Plaintiff's action concerns an alleged scheme by Defendant to induce persons to buy or hold securities by issuing artificially positive ratings on the stock of certain companies, and that the cause of action asserted thus concerns material misrepresentations or omissions of fact regarding the value of the securities." *Id.* (citing *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 01 Civ. 3013, 2001 WL 1182927, at *3 (S.D.N.Y. Oct. 9, 2001)). For the same reasons as Judge Swain, I reach the same conclusion.

As a result, Plaintiffs' claim is preempted by SLUSA, and must be dismissed.

---

[12] Plaintiffs themselves describe the complaint in *Dacey* as being "virtually identical" to the one in the case at bar. Memorandum of Law in Support of Plaintiffs' Cross-Motion for Remand and In Opposition to Defendant's Motion to Dismiss at 1.

## CONCLUSION

If Morgan Stanley acted in the manner Plaintiffs allege,[13] its conduct was dishonorable, and may well be actionable by individual investors on common law theories. However, for the reasons discussed above, Plaintiffs' putative class action falls within the purview of SLUSA, and must therefore be dismissed. Accordingly, Plaintiffs' motion to remand the case to the state court is denied, and Defendant's motion to dismiss the Amended Complaint is granted.

The Clerk of the Court is directed to dismiss the action, without prejudice to such rights and remedies as individual investors may have against Morgan Stanley under applicable law.

It is SO ORDERED.

Dated: New York, New York
May 2, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[13] Morgan Stanley denies that it did, and at the pleading stage there is no proof, one way or the other.

16